IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JUANITA FLORES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:19-CV-830-WKW |
| | ) | [WO] |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING ALABAMA, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>**MEMORANDUM AND OPINION ORDER**</u>

The events giving rise to this case began when Plaintiff Junita Flores ("Flores") suffered a back injury while working on Defendant Hyundai Motor Manufacturing Alabama, LLC's ("Hyundai") assembly line. After a stint on workers' compensation leave, two separate workers' compensation physicians cleared Flores to return to work at Hyundai without restrictions. Flores, however, did not return. Instead, she filed for, and eventually received, Social Security Disability Insurance ("SSDI") benefits. Ultimately, Hyundai terminated her employment with the company for excessive unexcused absences. Following her termination, Flores filed suit against Hyundai, bringing three counts under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.,: (1) failure to provide reasonable accommodations; (2) disability discrimination; and (3)

retaliation.  Before the court is Hyundai's motion for summary judgment (Doc. # 25), which has been fully briefed (Docs. # 26, 31, 32, 41, 43).

For the reasons discussed below, Hyundai is entitled to summary judgment on Counts 1 and 2 because Flores is estopped from arguing that she is a qualified individual under the ADA.  Namely, she offers no explanation for the inconsistency between the sworn statements in her SSDI application (*i.e.*, that her back injury severely limited nearly every facet of her life and left her unable to work) and her assertion that she could perform the essential functions of her job, with or without a reasonable accommodation.  Hyundai is also entitled to summary judgment on Count 3 because Flores has abandoned that claim.

## I.  JURISDICTION AND VENUE

Because this case arises under a federal statute, subject matter jurisdiction is proper under 28 U.S.C. § 1331 (federal question).  Personal jurisdiction and venue are not contested.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from the evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id*. Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials . . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs*., 276 F.3d 1275, 1279 (11th Cir. 2001).

### III.  BACKGROUND

**A.  <u>Relevant employment policies and practices.</u>**

Before diving into what happened, it is useful to detail Hyundai's employment policies and practices relevant to this case.

#### 1.  *ADA accommodation policy*

Hyundai's ADA accommodation policy provides that "[c]urrent [employees] may initiate a request for accommodation by submitting a request in writing on the 'Disability Accommodation Request Form' to the Head of Department."  Current employees can request this form from Hyundai's Human Resources office or access it on the company's website.  Once an employee makes a written request, a member of Hyundai's Safety Department "will investigate the need and alternatives for meeting the need for reasonable accommodation."  The policy further states that the employee requesting the accommodation and his or her supervisor "shall be consulted."  Moreover, "[t]he decision to approve or disapprove a request for accommodation will be in writing."  (Doc. # 27-11, at 3.)

#### 2.  *Permanent restriction placement procedure*

Hyundai's permanent restriction placement procedure outlines "the steps taken to place [an employee] who has been given permanent medical restrictions."  The procedure defines "permanent restriction" as "a medical restriction of unknown duration, indefinite duration, or will never expire and cannot be removed absent an

intervening act (e.g., corrective surgery)."  Once an employee's treating physician notifies Hyundai's on-site medical clinic that the employee has permanent restrictions, the clinic contacts Hyundai's Environmental Health and Safety Department ("EHS") to evaluate the restrictions.  Next, a member from EHS "will review the stations on the injured [employee's] line and determine if the permanent restrictions prevent the [employee] from returning to his/her line."  In the event that "the permanent restrictions prevent the [employee] from returning to his/her home line, [Human Resources] will be contacted and asked to provide a list of all open positions within [Hyundai]."  (Doc. # 27-20, at 2–3.)

### 3.  *Transfer policy–production*

Under Hyundai's transfer policy for employees in the production department, employees "whose indefinite physical or mental restrictions foreclose them from satisfactorily performing the job they hold with or without reasonable accommodation, will be considered for placement, with or without accommodation, as required by the [ADA]."  Further, the transfer policy provides that "[p]lacements of production team members with permanent medical restrictions will take priority over transfer requests."

When a vacancy arises "it shall be posted for Department/Group Transfer, provided the position cannot be filled by [an employee] whose indefinite physical or mental restrictions foreclose [him or her] from satisfactorily performing the job [he

or she] hold[s] with or without reasonable accommodation." Hyundai posts the vacancy plant wide and on its website. Moreover, an eligible employee "with the longest length of . . . service shall be placed in the open position." These job postings are active for forty-five days and transfer jobs not filled due to business needs within the forty-five-day window are ended. (Doc. # 27-42, at 2–3.)

### 4. Procedures for workers' compensation and temporary medical restrictions

When an employee suffers an injury at work, he or she is required to report the injury to the group leader, who in turn sends the employee to Hyundai's on-site medical clinic—Progressive Health ("Progressive"). (Abrams Dep., at 27–28.)[1] Once the employee arrives at the clinic, he or she fills out a "Team Member Statement," which initiates the workers' compensation claims process. (Abrams Dep., at 24–25.) Progressive then emails the Team Member Statement to Hyundai's EHS Department to provide notice that the employee has suffered an injury. (Abrams Dep., at 28.)

Progressive medical staff initially directs the employee's treatment and care and determines whether the employee has any work-related restrictions flowing from his or her injury. (Tunnell Dep., at 39.) When a workers' compensation claim is

---

[1] Hyundai does not operate the on-site medical clinic. Rather, Progressive, an independent third-party, operates the facility. (*See* Abrams Dep., at 25.)

made, as it was here, Hyundai's workers' compensation insurer sends the employee to a physician of its choice for evaluation and treatment. The employee's health care provider makes the determination as to whether the employee has any work-related restrictions, and whether any such restrictions are temporary or permanent. (Tunnell Dep., at 44–45.) Naturally, if the employee's health care provider decides that the employee has permanent restrictions, then Hyundai's permanent restriction policy applies.

If, however, the employee's health care provider determines that the employee has temporary work-related restrictions, then Progressive contacts the EHS safety specialist on duty at that time, and the safety specialist evaluates whether the employee's temporary restrictions can be accommodated. (Tunnell Dep., at 43.) The EHS safety specialist makes this determination by visiting the employee's workstation—where he or she observes and analyzes how the employee's job is performed—and then evaluates whether the employee's temporary restrictions would prevent him or her from performing his or her job. (Tunnell Dep., at 42; *see also* Mancil Dec., at 2–4.) While this process is similar to Hyundai's permanent restriction policy described above, it differs in two key respects: (1) Hyundai's Human Resources Department is not contacted to provide a list of all available openings; and (2) the EHS safety specialist does not meet or consult with the employee about his or her temporary restrictions. (Mancil, Dep., at 30–31.)

7

Progressive documents the safety specialist's accommodation decision concerning the employee's temporary work-related restrictions in a Duty Disposition Report ("DDR"). The DDR includes information about the employee's visit to the medical clinic, medical treatment, and his or her restrictions. Progressive emails the DDR to Hyundai's EHS Department and workers' compensation team. (Abrams Dep., at 43–44.)

### 5. *Attendance and serious misconduct policies*

According to Hyundai's attendance policy in effect in March 2018, "the minimum acceptable standard of attendance [was] 98%." (Doc. # 27-15, at 2.)[2] The policy further provided that "[a]ny scheduled workday missed is considered an absence," except that "work time missed due to . . . sick leave, work-related injury or illness, [and] personal leave of absence . . . shall not be counted as an absence and are not cause for corrective action." (Doc. # 27-15, at 2.) According to Scott Gordy ("Gordy"), Hyundai's Senior Human Resources Manager, and Jamie Spaulding ("Spaulding"), Hyundai's Assistant Manager of Human Resources, "sick leave," for purposes of the attendance policy, constitutes time out on short term disability ("STD") leave. (Gordy Dep., at 26; Spaulding Dec., at 3.)[3] Under the policy, an

---

[2]   On December 19, 2018, Hyundai increased the minimum acceptable standard of attendance to 99%. (Doc. # 27-16, at 2.)

[3]   Hyundai offers its hourly employees STD benefits, which are administered by an insurance company known as The Hartford ("Hartford").

employee's continued unacceptable attendance is grounds for corrective action "up to and including termination."  (Doc. # 27-15, at 5.)

Hyundai's serious misconduct policy provides that "[t]here are certain things [an employee] can do that by nature are so serious that" termination of employment may be considered.  Excessive violations of Hyundai's attendance policy qualify as serious misconduct.  (Doc. # 27-17, at 2.)

**B.  Flores's injury and subsequent treatment.**

Flores began working for Hyundai in 2005 as a production team member in the company's welding section.  During Flores's fourteen-year career with Hyundai, she spent time in the company's general assembly section, paint section, and welding section.  (Flores Dep., at 19–21.)  However, Flores worked the bulk of her tenure with Hyundai in the weld shop.

In March 2018, Flores worked at the body control two ("BC-2") station in Hyundai's welding section.  Flores testified that her job duties in this position included "correcting defects . . . picking up heavy objects . . . a lot of bending . . .," and moving at a fast pace.  (Flores Dep., at 34.)  Flores also testified that her position at the BC-2 station required her to physically remove defective hoods, doors, and fenders from cars on the production line and transport the parts down a set of stairs.  (*See* Flores Dep., at 41–45.)  On March 28, 2018, while working at the BC-2 station,

Flores injured her back when she lifted a car's hood to fix its fender.  (Doc. # 27-21.)

Immediately following her injury, Flores reported to Progressive.  At the clinic, a nurse practitioner evaluated Flores and generated a DDR.  (Doc. # 27-22, at 2.)  In the March 28, 2018 DDR, the nurse practitioner issued Flores the following work-related restrictions:  No bending at the waist and no twisting or turning greater than thirty degrees.  (Doc. # 27-23, at 2.)  Progressive then contacted Mike Mancil ("Mancil"), Hyundai's safety specialist on duty at the time, to inform him of Flores's restrictions.  (Doc. # 27-22.)  Mancil reviewed Flores's job responsibilities at the BC-2 station and determined that she could not be accommodated due to the restriction of no bending at the waist.  (Mancil Dep., at 33.)[4]  Because the restriction could not be accommodated, Flores was sent home, and Progressive instructed her to follow up with the clinic on April 2, 2018.  (Doc. # 27-23, at 2.)  Progressive also emailed Kimberly Abrams ("Abrams"), Hyundai's workers' compensation specialist, notifying her of Flores's injury.  (Doc. # 27-22.)  As a result, Hyundai's workers' compensation insurer, Broadspire, sent Flores to Dr. Michael Davis, a board-certified orthopedic surgeon, for treatment.  (Doc. # 26, at 20.)

---

[4]  To determine whether a restriction could be accommodated, Mancil testified that he would speak to Progressive about the restriction, identify all the jobs that the employee was certified to perform, and then go to the employee's workstation to observe the responsibilities associated with the position.  (Mancil Dep., at 33–34.)

On April 2, 2018, Flores returned to the Progressive clinic. The DDR generated from that visit indicates that the following work-related restrictions were issued: Occasional walking or standing and no bending greater than thirty degrees. (Doc. # 27-23, at 3.) Again, Mancil reviewed these restrictions and determined that Flores could not be accommodated. (Doc. # 27-3, at 3.) Progressive instructed Flores to follow up with the clinic after she went to a previously scheduled MRI appointment. (Doc. # 27-23, at 3.)

Four days later, Progressive saw Flores again. The DDR associated with that visit listed the same work-related restrictions as the previous DDR: Occasional walking or standing and no bending greater than thirty degrees. (Doc. # 27-23, at 4.) Progressive imposed the restrictions until May 4, 2018, indicating that they were temporary. Once again, Mancil reviewed these restrictions and determined that Flores could not be accommodated. (Doc. # 27-23, at 4.) Progressive instructed Flores to follow up with the clinic after her orthopedic appointment (presumably with Dr. Davis).

Between April 11 and June 20, Flores returned to the Progressive clinic three times. (*See* Doc. # 27-23, at 5–7.) The DDRs associated with these visits listed the following temporary work-related restrictions: Occasional twisting, turning, and bending, as well as a twenty to twenty-five-pound lifting limitation. And each DDR produced during this period, like the previous DDRs, indicates that a Hyundai safety

11

specialist reviewed Flores's restrictions and determined that they could not be accommodated.  The DDRs also indicate that Dr. Davis was treating Flores during this period.

On July 23, 2018, Dr. Davis cleared Flores to return to work at Hyundai, finding that she had zero percent impairment and that she had reached maximum medical improvement as it related to her initial back injury.  (Docs. # 27-24, at 2; 27-25, at 2.)[5]  On August 2, 2018, unhappy with Dr. Davis's conclusion, Flores emailed Broadspire's workers' compensation representative, Jacqueline Piper-Lennon, requesting a "panel of four."[6]  Broadspire provided Flores with a panel of four physicians from which she selected Dr. Jeffry Pirofsky, D.O.  (Doc. # 27-26, at 2.)

On August 28, 2018, Dr. Pirofsky cleared Flores to return to full duty work at Hyundai with no restrictions.  (Doc. # 27-28, at 2.)  Dr. Pirofsky's August 28 report

---

[5]  Dr. Davis's July 23 report also notes that Flores failed certain aspects of her workers' compensation job specific test, indicating that she was not "going to meet the physical demands to go back to Hyundai."  Specifically, she "did not meet the ability on standard grip, key pinch, thumb press, 2-hand lift waist to shoulder height, push/pull."  Nevertheless, Dr. Davis concluded that these were "upper extremity issues" unrelated to Flores's back injury.  (Doc. # 27-25, at 2.)  Flores testified that she did not return to work because of these upper extremity issues, but that her personal physician, Dr. Myrtle E. Goore, ultimately cleared her from these issues.  (Flores Dep., at 135–36.)

[6]  *See* Ala. Code § 25-5-77(a) ("If the employee is dissatisfied with the initial treating physician selected by the employer and if further treatment is required, the employee may so advise the employer, and the employee shall be entitled to select a second round physician from a panel or list of four physicians selected by the employer.").

provided that "based upon [Flores's] MRI results I am unable to explain the distribution of her symptoms.   I also have some concerns about her exam inconsistencies.  For diagnostic and therapeutic reasons I would recommend bilateral facet injections . . . .   I will release her to work as recommended by Dr. Davis." (Doc. # 27-27, at 4.)  Dr. Pirofsky scheduled a follow-up appointment with Flores in two weeks' time.   That same day, Flores went to the Progressive clinic seeking approval to return to work.   The August 28 DDR, consistent with Dr. Pirofsky's report, cleared Flores to return to regular work at the BC-2 station with a two-week "ramp up"[7]  period.  (Doc. # 27-29, at 2.)

Flores returned to work the next day.   Her return, however, was short lived because when she informed her supervisor, Keith Ulrich, that she was experiencing back pain, he sent Flores to the Progressive clinic for evaluation.  (Doc. # 31.)  Like previous instances, Progressive generated a DDR outlining certain temporary work-related restrictions:   No bending and no overhead activity, as well as a ten-pound lifting limitation.  (Doc. # 27-30, at 4.)  Hyundai's EHS senior manager, Stephen Tunnell,   reviewed   Flores's   restrictions   and   determined   that   they   could   not   be

---

[7]  According to Abrams, when an employee returns to his or her position after being out on workers' compensation leave for more than thirty days, as Flores was, Hyundai gives the employee a two-week ramp up period where a temporary worker assists the returning employee by doing a portion of the work in an effort to allow the returning employee to reacclimate to his or her position.   During the ramp up period, the returning employee gradually takes over more of the responsibilities until he or she is fully reacclimated.  (*See* Abrams Dep., at 118.)

accommodated.  (Doc. # 27-30, at 2.)  Progressive instructed Flores to follow up with the clinic after her pending appointment with Dr. Pirofsky.

On September 12, 2018, Dr. Pirofsky again cleared Flores to return to work without restrictions.  (Doc. # 27-27, at 8.)  While he stated that he was "unable to explain the cause of [Flores's] pain and distribution," Dr. Pirofsky also concluded that Flores had reached maximum medical improvement.  (Doc. # 27-32, at 2.)  Flores returned to work at Hyundai on September 12, but was removed from her BC-2 station and sent to the Progressive medical clinic after members of Hyundai's EHS department observed her having difficulty working and she informed them that she was experiencing back pain.  (Flores Dep., at 256–58.)  Progressive gave Flores the following temporary work-related restrictions:  Occasional standing until seen by an orthopedist and no bending at the waist.  (Doc. # 27-33, at 4.)  Hyundai sent Flores home after safety specialist Mancil reviewed these restrictions and determined that they could not be accommodated.  (Doc. # 27-33, at 2.)  Progressive instructed Flores to follow up with the clinic after she saw an orthopedist.

Flores went to the Progressive medical clinic the following day.  Two DDRs were generated as a result.  The first DDR reflected that both Dr. Davis and Dr. Pirofsky had cleared Flores to return to full duty work and that she had been released from their care.  (Doc. # 27-34, at 2.)  The second DDR reflected that Flores's personal physician, Dr. Goore, whom she had seen that morning prior to visiting

Progressive, had taken her out of work due to her high blood pressure.  (Doc. # 27-35, at 2; *see also* Flores Dep., at 59.)  Progressive sent Flores home per Dr. Goore's instructions and told her to follow up with the clinic once Dr. Goore released her to work.

From March 28, 2018 (the date of her initial injury) until September 12, 2018, Flores was on approved workers' compensation leave.  (Flores Dep., at 123.)  Starting on September 13, 2018, however, Flores was released from workers' compensation care and ceased receiving workers' compensation benefits from Broadspire based upon Dr. Davis's and Dr. Pirofsky's determinations that she had reached maximum medical improvement and that she could return to work without any restrictions. (Flores Dep., at 234; Doc. # 30-1.)  Flores testified that she did not have any permanent medical restrictions prior to September 13, 2018.  (Flores Dep., at 102.)

Despite clearance from the workers' compensation physicians, Flores never returned to work at Hyundai.  Flores testified that Dr. Goore kept her out of work from September 20, 2018 until December 9, 2018, to allow her time to see a neurologist believing that her high blood pressure was related to her back injury. (Flores Dep., at 148–49, 159.)  Ultimately, in early 2019, Dr. Goore referred Flores to Dr. Rosa Bell, a neurologist.  (Flores Dep., at 153.)  On March 7, 2019, Dr. Bell issued Flores the following temporary non-work-related restrictions:  No twisting,

squatting, and climbing; occasional walking and standing; and a lifting limitation of ten pounds.  (Flores Dep., at 154.)  Between September 20, 2018 and March 7, 2019, Flores testified that she sent Progressive doctor's excuses from Dr. Goore and Dr. Bell explaining that she was under their care and that she needed to remain out of work until they cleared her to return.  (Flores Dep., at 60, 154, 160–61.)  To date, neither Dr. Goore nor Dr. Bell has released Flores to return to work.  (Flores Dep., at 60.)

In August of 2018, while still employed with Hyundai, Flores filed for STD benefits with Hartford.  (Flores Dep., at 64; Doc. # 27-7.)  After applying for STD benefits, Flores was given the opportunity to submit medical information supporting her claim.  (Doc. # 27-7, at 3.)  On November 1, 2018, Hartford denied her claim. (Flores Dep., at 64; Doc. # 27-7, at 3.)  Five days later, Hyundai sent Flores the following letter:

> You initially applied for Short Term Disability (STD) with the Hartford, for your leave of absence starting September 13, 2018. However as of the date of this letter, The Hartford reportedly has denied you STD from September 13, 2018 to current date.
>
> [Hyundai] has no documentation showing that you are on any form of [Hyundai] approved leave as of September 13, 2018 to current date.  No later than November 20, 2018 please provide [Hyundai] with documentation showing that your work absences, September 13, 2018 to current date, are covered by some form of [Hyundai] approved leave.
>
> Your failure to provide this documentation by November 20, 2018, will result in those days counting against your attendance percentage for purposes of [Hyundai's] Attendance Policy and/or Serious Misconduct

> Policy . . . . Your failure to provide the required documentation by
> November 20, 2018, may result in [Hyundai] terminating your
> employment.

(Doc. # 27-36, at 2.)  After receiving this letter, Flores filed an administrative appeal

with Hartford requesting that the company reconsider the denial of her application

for STD benefits.  On December 5, 2018, Hartford denied Flores's appeal.  (Doc. #

27-37.)  Concerning documentation covering her unapproved absences highlighted

in the letter, Flores testified that she provided Progressive—not Hyundai—with

doctor's excuses from Dr. Goore and Dr. Bell.  (Flores Dep., at 60, 154, 160–61.)

## C. **Flores's SSDI benefits.**

Importantly, on January 7, 2019, Flores filed for SSDI benefits.  (Flores Dep.,

at 216.)  The Social Security Administration initially denied Flores's application.

(Flores Dep., at 66–67.)  However, Flores appealed that decision, and her application

for SSDI benefits was granted on December 21, 2020.  (Doc. # 36-1.)  The

Administrative Law Judge ("ALJ") concluded that Flores had "been under a

disability as defined in the Social Security Act since March 28, 2018, the alleged

onset date of disability . . . ."  (Doc. # 36-1, at 10.)  Given the limitations associated

with her disability, the ALJ also concluded that Flores was "unable to perform her

past relevant work, as actually or generally performed."  (Doc. # 36-1, at 10.)

**D.  Flores's termination.**

On March 14, 2019, Rob Clevenger, Hyundai's Manager of the Team Relations Department, sent a memo to the company's Employment Review Team regarding Flores's unexcused absences.  The memo noted that Flores had been absent from work since September 13, 2018; that Hartford had denied her application for STD; that Hyundai had sent her a warning letter about her absences; and that, as of the date of the memo, she had been absent for more than 100 days without providing any documentation to show that her absences were covered by any form of Hyundai approved leave.  Additionally, the memo discussed the relevant provisions of Hyundai's attendance and serious misconduct policies and outlined past employment decisions in cases involving excessive absenteeism.  (Doc. # 27-38.)

After reviewing the memo, Gordy decided to terminate Flores's employment with the company.  (Gordy Dep., at 40.)  Gordy testified that he did not review Flores's personnel file or work performance prior to making his decision to end her employment.  (Gordy Dep., at 43.)  Gordy also testified that he did not meet with Flores prior to making his decision.  (Gordy Dep., at 10.)  On March 20, 2019, Hyundai sent Flores a letter notifying her that her employment with the company was terminated because she had 119 days of unexcused absences in violation of the company's attendance and serious misconduct policies.  (Doc. # 27-39.)

**E.  Flores's transfer requests.**

It is undisputed that Flores did not make a written request for an accommodation pursuant to Hyundai's ADA accommodation policy. (Flores Dep., at 72–73.)  Flores did, however, make three oral requests for transfer (while still employed at Hyundai) in June 2018.  (Doc. # 31, at 11.)

First, Flores called Abrams and asked if she could transfer to a job in the welding section's tool room.  (Flores Dep., at 51–52.)  However, there was only one position in the tool room, and it was not vacant at that time.  (Flores Dep., at 54; Abrams Dep., at 166.)

Second, Flores called another Hyundai employee, Christopher Fletcher ("Fletcher"), to inquire about transferring to an open quality control position in the paint section.  (Flores Dep., at 52.)  Fletcher submitted an application for the position on Flores's behalf.  (Flores Dep., at 98.)  Thirty other Hyundai employees submitted applications for this position, five of whom had more seniority than Flores.  (Doc. # 27-41, at 2; Flores Dep., at 133.)  Moreover, given that Flores did not have a permanent medical restriction at the time Fletcher submitted a bid on her behalf, she did not receive priority over the other transfer requests.  (Doc. # 27-42.)  Ultimately, the position went unfilled due to business reasons, and the posting period expired

after forty-five days pursuant to Hyundai's transfer policy.  (Gordy Dep., at 53–54; Doc. # 27-42, at 2–3.)

Third, Flores again called Abrams requesting a transfer to a quality control position in the welding section.  (Flores Dep., at 98; Abrams Dep., at 91–92.)  Flores was interested in the position because the Hyundai employee holding the job at the time, Terrish Garcelle McKinney ("McKinney"), had indicated that he was going to resign.  (Flores Dep., at 98.)  Abrams explained to Flores that she needed to have a permanent medical restriction for her to transfer to McKinney's position as an accommodation.  (Abrams Dep., at 93–94.)  Flores did not submit an application for McKinney's position, nor did Abrams submit one on Flores's behalf.  (Flores Dep., at 97–98.)

On June 23, 2018, McKinney did in fact resign from his position.  (Spaulding Dec., at 3.)  Earlier in June 2018, two other Hyundai employees also vacated positions in the welding quality control section, resulting in three open positions. (Spaulding Dec., at 3.)  Hyundai posted these open positions for transfer from June 20, 2018 until June 26, 2018, pursuant to the company's transfer policy.  (Spaulding Dec., at 3.)[8]   Thirty-five Hyundai employees submitted applications for these positions, eleven of whom had more seniority than Flores.  (Spaulding Dec., at 6.)

---

[8]  According to Spaulding, "[s]ince there was an active posting for the same position at the time of [McKinney's] resignation, no new posting was required; instead three [employees] were selected for transfer instead of two . . . as originally planned."  (Spaulding Dec., at 3.)

According to the terms of the company's transfer policy, Hyundai awarded the three positions, including McKinney's, to the three most senior applicants.  (Spaulding Dec., at 3.)

## IV.  DISCUSSION

After exhausting her administrative remedies, Flores filed this lawsuit.  She asserts three counts against Hyundai, all arising under the ADA:  (1) failure to provide a reasonable accommodation; (2) discrimination on the basis of disability; and (3) retaliation.  (Doc. # 1, at 3–5.)  As previously noted, Hyundai's motion for summary judgment is due to be granted on Counts 1 and 2 because Flores is estopped from arguing that she is a "qualified individual" within the meaning of the ADA.  42 U.S.C. § 12111(8).  Hyundai's motion for summary judgment on Count 3 is also due to be granted because Flores has abandoned that claim.  Each issue will be addressed in turn.

## A.  Flores is estopped from arguing that she is a qualified individual.

Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability."  § 12112(a).  To establish a *prima facie* case of discrimination under the ADA, Flores "must produce sufficient evidence to permit a jury to find that she:  (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability."  *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (cleaned up).  While Hyundai argues

that Flores fails to satisfy all three elements of her *prima facie* case, the court need only address the qualified individual prong because it is dispositive for purposes of summary judgment.[9]

The ADA defines the phrase "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). The term "does not include the marginal functions of the position." *Id*. "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." *Lewis*, 934 F.3d at 1182 (cleaned up). Evidence of whether a particular function is essential may include the employer's judgment as to what is essential, written job descriptions, the amount of time spent on performing the function, the consequences of not requiring the employee to perform the function, the work experience of past employees in the job, and the current work experience of employees in similar jobs. § 1630.2(n)(3).

---

[9] Hyundai also argues that the doctrines of res judicata and collateral estoppel bar Flores's ADA claims in whole or in part. (Doc. # 41.) Specifically, Hyundai contends that the Circuit Court of Montgomery County, Alabama's judgment, which denied Flores further workers' compensation benefits because she chose "to not return to work at [Hyundai], though she was released to normal duty by Dr. Pirofsky on September 12, 2018," has preclusive effect on certain aspects of Flores's claims in this lawsuit. (Doc. # 39-1, at 4.) However, the court need not address the preclusive effect of the state court's judgment concerning Flores's workers' compensation claim because she fails to establish that she is a qualified individual.

As noted above, Flores applied for and received SSDI benefits retroactive to the date of her back injury—March 28, 2018.  (Doc. # 36-1.)  In that proceeding, Flores proved that she is disabled within the meaning of the Social Security Act ("SSA") because she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Moreover, Flores's disability, under the SSA, is "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  § 423(d)(2)(A).

To be sure, Flores's "pursuit, and receipt, of SSDI benefits does not automatically estop [her] from pursuing an ADA claim." *Cleveland v. Policy Mgmt. Sys.*, 526 U.S. 795, 798 (1999).  "Nor does the law erect a strong presumption against [her] success under the ADA."  *Id.*  However, to survive Hyundai's motion for summary judgment, Flores must "explain why [her] SSDI contention is consistent with her ADA claim that she could perform the essential functions of her previous job, at least with reasonable accommodation." *Id.* (quotations omitted and alteration added).  And Flores's "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or [her] good-faith belief in," her previous

sworn statements in her SSDI application, she is nevertheless a qualified individual. *Id*. at 807. Hence, Flores "cannot simply ignore the apparent contradiction that arises out of [her] earlier SSDI total disability claim." *Id*. at 806.

Similarly, the Eleventh Circuit has explained that "[w]hether in any particular situation there is an inconsistency between applying for [SSDI] benefits and bringing an ADA claim will depend upon the facts of the case, including the specific representations made in the application for disability benefits and the nature and extent of the medical evidence in the record." *Talavera v. Sch. Bd. of Palm Beach Cnty.*, 129 F.3d 1214, 1220 (11th Cir. 1997) (alterations added). However, "[b]ecause the ADA reserves its protections for individuals still able to perform the essential functions of a job, albeit perhaps with reasonable accommodation, a plaintiff who is totally disabled and unable to work at all is precluded from suing for discrimination thereunder." *Slomcenscki v. Citibank, N.A.*, 432 F.3d 1271, 1280 (11th Cir. 2005) (alteration added). Additionally, an ADA plaintiff "is estopped from denying the truth of any statements made in her disability application" because she "should not be permitted to disavow any statements made in order to obtain [SSDI] benefits." *Talavera*, 129 F.3d at 1220.

Here, Flores averred to the Social Security Administration in her sworn SSDI application that the pain stemming from her back injury made it "unbearable to function;" that she could not stand up to cook, clean, or shop; that she only slept two

24

hours a night because of pain in her back and legs; that sitting down caused pain and numbness in her legs; and that she could only lift two pounds and walk thirty feet before "burning and shooting pain" occurred.  (Doc. # 27-45, at 2–7.)  Flores also asserted in her application that her back injury limited her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and use her hands.  (Doc. # 27-45, at 7.)  What's more, Flores alleged that she has been unable to work due to her back injury.  (Docs. # 36-1, at 7; 27-46, at 5.)  Based on these allegations, and other medical evidence associated with Flores's SSDI application, the ALJ determined that Flores had "been under a disability as defined in the [SSA] since March 28, 2018 . . . ."  (Doc. # 36-1, at 10.)

Flores's ADA claims in Counts 1 and 2 fail because she makes no attempt to reconcile her sworn statements to the Social Security Administration with her corresponding, yet inconsistent contention, that she was physically capable of performing the essential functions of her job at the BC-2 station or the jobs to which she requested a transfer.  Rather than providing a sufficient explanation—as she must to defeat Hyundai's motion for summary judgment—Flores has chosen to "simply ignore" the inconsistency between her SSDI contentions and her claim that she is a qualified individual. *Cleveland*, 526 U.S. at 806.

Flores's failure to square her SSDI contentions and her ADA claims in Counts 1 and 2 is especially problematic when viewed in conjunction with the essential

functions associated with her position at the BC-2 station and the transfer positions. For example, the undisputed evidence shows that the essential functions of Flores's BC-2 position included frequent lifting of heavy objects (up to fifty pounds), frequent bending, and moving at a fast pace. (Flores Dep., at 34, 220.) The undisputed evidence also shows that the essential functions of the quality control position in the paint section included "frequent bending, frequent twisting, frequent overhead [work], constant lifting of thirty-seven . . . pounds (trunk lids), and constant walking/standing." (Mancil Dec., at 3.) Further, the essential functions of the quality control position in the welding section, when viewed in the light most favorable to Flores, included long stretches of performing computer work (presumably sitting or standing), walking, and occasional twisting and bending. (McKinney Dec., at 2.)[10] However, Flores's representations in her SSDI application, which she is estopped from denying the truth of, are plainly incompatible with her argument that she could perform these essential functions.[11]

---

[10]   Hyundai offers a different description of the essential functions of the quality control position in the welding shop. Namely, it asserts that that the job required "frequent bending, frequent twisting, frequent lifting of forty . . . pounds (vehicle hoods) and twenty pounds (trunk lids), constant walking/standing, and occasional reaching overhead. (Mancil Dec., at 3.) While Hyundai's judgment about the essential functions of the quality control position in the welding shop is "entitled to substantial weight in the calculus, this factor alone is not conclusive." *Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014) (cleaned up). Regardless, any dispute concerning the essential functions of this position is immaterial because Flores is not a qualified individual under either description.

[11]   Although the record does not indicate what the essential functions of tool room position were, Flores's request for transfer to this job was not a reasonable accommodation because the

Without addressing the inconsistencies discussed above, Flores argues that Hyundai's failure to engage in an "interactive process"[12] creates a genuine dispute of material fact concerning whether she is a qualified individual.  (Doc. # 31, at 19–20.)  Specifically, she argues that had Hyundai engaged in an interactive process, the company could have provided her with a reasonable accommodation in the form of limiting her responsibilities at the BC-2 station to the "paint stay" rotation.  (Doc. # 31, at 20.)  Flores contends that paint stay rotation only required the employee "to wipe down" vehicle doors and "insert a clamp on the door latch."  (Flores Dec., at 3.)  She further asserts that the rotation "did not require lifting hoods, doors, or any other car body part," nor did it "require [her] to bend at the waist greater than 30 degrees, to twist, to squat, or to climb stairs."  (Flores Dec., at 3.)

The problem with Flores's interactive process argument is that she fails to produce any evidence indicating that she asked Hyundai to limit her job responsibilities at the BC-2 station to the paint stay rotation.  Indeed, her testimony

---

position was not vacant at the time she asked to be moved there.  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001) (explaining that an employee's transfer request "does not require the employer to bump another employee from a position in order to accommodate a disabled employee"); *Boyle v. City of Pell City*, 866 F.3d 1280, 1289–90 (11th Cir. 2017) (holding that the plaintiff "did not meet his burden of identifying a reasonable accommodation" because the defendant "was not required to reassign [the plaintiff] to a non-vacant position") (alteration added).

[12]  29 C.F.R. § 1630.2(o)(3) provides that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation" in an effort to "identify the precise limitations resulting from the disability and potential reasonable accommodations . . . ."

demonstrates that she never made such a request.  (Flores Dep., at 204–05.)  Thus, Hyundai did not have a duty to provide Flores this accommodation, much less engage in an interactive process.  *See D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1031 (11th Cir. 2020) ("An employer has no obligation to make any accommodation unless, and until, the employee specifically requests an accommodation."); *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (holding that when an employee fails to identify a reasonable accommodation, an employer "is under no duty to engage in an interactive process . . .") (quotation marks omitted); *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) (holding that "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made . . .").

To the extent that Flores argues that Hyundai had a duty to engage in an interactive process concerning the transfer requests that she did make, that argument also falls short.  "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable."  *Earl*, 207 F.3d at 1367 (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)).  The Eleventh Circuit has noted that "the use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to accommodate

an employee in any manner in which that employee desires." *Id*. (cleaned up).  And "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." *Id*. (quoting *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)).

Here, none of Flores's transfer requests was a reasonable accommodation. First, Flores's request for transfer to the tool room was not reasonable because the position was not vacant. *See supra*, at note 10.  Second, Flores's requests for transfer to the quality control positions were not reasonable because, as her SSDI application demonstrates, she could not perform the essential functions of those jobs. *See Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) ("An accommodation is only reasonable if it allows the disabled employee to perform the essential functions of the job in question.").  Because none of Flores's transfer requests was reasonable, Hyundai's "lack of investigation into reasonable accommodation" was "unimportant." *Earl*, 207 F.3d at 1367.

In sum, Flores is estopped from arguing that she is a qualified individual within the meaning of the ADA because she offers no, let alone sufficient, explanation for the inconsistency between her SSDI contentions and her claim that she could perform the essential functions of her job at the BC-2 station or the essential functions of the quality control positions. *Cleveland*, 526 U.S. at 807; *see also Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 147–48 (11th Cir.

2021) (holding that the defendant was entitled to summary judgment because the plaintiff failed to explain "why her contentions before the Social Security Administration were consistent with her ADA claim . . ."); *Kurzweg v. SCP Distribs., LLC*, 424 F. App'x 840, 844 (11th Cir. 2011) (same); *Anderson v. Georgia-Pacific Wood Prods., LLC*, 942 F. Supp. 2d 1195, 1209 (M.D. Ala. 2013) (same).

## B. **Flores has abandoned her retaliation claim.**

Count 3 can be easily resolved.  Hyundai argues that Flores fails to establish her *prima facie* case of retaliation "because there is no evidence to establish any causal link between her EEOC charge and her termination."  (Doc. # 26, at 67.) Specifically, Hyundai points out that Flores filed her discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on November 28, 2019— twenty-two days after Hyundai warned her that her excessive unexcused absences violated the company's attendance and serious misconduct policies.  (Doc. # 26, at 67.)  Hyundai also contends that Gordy, the decision maker for Flores's termination, did not have any knowledge that Flores filed an EEOC charge at the time he decided to end her employment.  (Doc. # 26, at 68–69.)  Additionally, Hyundai asserts that even if Flores could make out her *prima facie* case of retaliation, her claim still fails because she cannot show that the company's legitimate, non-retaliatory reason for her termination—excessive absences—was pretext.  (Doc. # 25, at 69–70.)  Flores

does not respond to these arguments in her opposition brief.  (Doc. # 31.)  In fact, she makes no mention of her retaliation claim.

Thus, Hyundai's motion for summary judgment on Count 3 is due to be granted because Flores has abandoned that claim.  *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (noting that "when a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (cleaned up); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Road Sprinklers Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (explaining that the district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

## V.  CONCLUSION

To defeat Hyundai's motion for summary judgment, Flores needed to provide a sufficient explanation for the contradiction between her SSDI contentions and her claim that she is a qualified individual.  Flores also needed to respond to Hyundai's arguments concerning her retaliation claim in Count 3.   She did neither. Accordingly, it is ORDERED that Hyundai's motion for summary judgment (Doc. # 25) is GRANTED.

A separate final judgment will be entered.

DONE this 12th day of May, 2021.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE